IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN ALEXANDER, | : | Civil No. 3:19-cv-1749 |
| Plaintiff | : | (Judge Mariani) |
| v. | : | |
| LAUREL HARRY, *et al.*, | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff, John Alexander, an inmate formerly confined in the State Correctional Institution, Camp Hill ("SCI-Camp Hill"), Pennsylvania,[1] initiated this action pursuant to 42 U.S.C. § 1983. (Doc. 1). The named Defendants are Correct Care Solutions, Inc., its employees Medical Supervisor Melissa M. Doe, Nurse Karen Wadley and John Doe, MD; and SCI-Camp Hill employees Warden Laurel Harry, and Correctional Officers Kinner, Trojan, Hill and Johnson. (*Id.*). Along with the filing of his complaint, Plaintiff filed a motion for leave to proceed *in forma pauperis*. (Doc. 2). An initial screening of the complaint has been conducted, and for the reasons set forth below, the motion to proceed *in forma pauperis* will be granted, and the complaint will be dismissed.

I.   **Standards**

---

[1]   Plaintiff is currently housed in the Smithfield State Correctional Institution, Huntingdon, Pennsylvania.

1

### A. Screening Provisions of the Prison Litigation Reform Act

The Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996) ("PLRA"), authorizes a district court to review a complaint in a civil action in which a prisoner is proceeding in forma pauperis or seeks redress against a governmental employee or entity. *See* 28 U.S.C. § 1915(e)(2),[2] 28 U.S.C. § 1915A.[3] The Court is required to identify cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B), 28 U.S.C. § 1915A(b). This initial screening is to be done as soon as practicable and need not await service of process. See 28 U.S.C. § 1915A(a).

### B. Federal Rules of Civil Procedure 8 and 20

"Pleadings must be construed so as to do justice." FED. R. CIV. P. 8(e). Rule 8(d)(1)

---

[2]   Section 1915(e)(2) of Title 28 of the United States Code provides:
(2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-
    (A) the allegation of poverty is untrue; or
    (B) the action or appeal -
        (i) is frivolous or malicious;
        (ii) fails to state a claim on which relief may be granted; or
        (iii) seeks monetary relief against a defendant who is immune from such relief.

[3]   Section 1915A(b) of Title 28 of the United States Code provides:
(b) On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint-
    (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
    (2) seeks monetary relief from a defendant who is immune from such relief.

states, in pertinent part, that "[e]ach allegation must be simple, concise and direct." Rule 20(a)(2), states that "[p]ersons ... may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." FED. R. CIV. P. 20(a)(2). Although Rule 20 is a flexible rule that allows fairness and judicial economy, the rule only permits "joinder in a single action of all persons asserting, or defending against, a joint, several, or alternative right to relief that arises out of the same transaction or occurrence and presents a common question of law or fact." 7 Charles Allen Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1652 at 371-72 (1986).

## II. Facts Alleged in Complaint

Plaintiff alleges that on April 17, 2017, at approximately 6:00 pm, Defendant, Nurse Karen Wadley and Defendant, Correctional Officer Trojan, entered the restricted housing unit to give inmates their medications. (Doc. 1, Complaint). They arrived at Plaintiff's cell at approximately 6:30 pm, at which time Nurse Wadley "gave Plaintiff a white folded up paper cup, containing what Plaintiff thought was his medications inside." (*Id.*). Plaintiff states that he "unfolded said cup and consumed all but one of the pills, because one of the pills was too big to swallow without breaking it in half." (*Id.*). Plaintiff "took said pill from

3

out of his mouth, showed it to Ms. Wadley, and asked her if she was certain that said pill was one of Plaintiff's prescribed pills." (*Id.*). Nurse Wadley allegedly responded "Alexander just take the pill, it's a as needed fiber, and yes I'm certain that those are your meds, you get fiber, zantac, bentel and lamento." (*Id.*). Plaintiff "then broke the pill in half and swallowed it." (*Id.*). Before Nurse Wadley left Plaintiff's cell, he realized she did not mention a medication named "Geadon." (*Id.*). When questioned about it, Nurse Wadley began "scrolling through the dozens of labeled envelopes containing different inmates' medications, while at the same time, claiming that Plaintiff did not get Geadon." (*Id.*). However, "once Ms. Wadley came across Plaintiff's envelope still containing his meds inside, she paused, looked up at him with an unsettling facial expression, then stated, 'Oh I'm sorry Alexander you do get Geadon', before quickly walking away from Plaintiff's cell door with a smirk on her face." (*Id.*). Plaintiff contends that as "she walked passed 15 cell (Inmate Ronald Alston)", she stated "I'll be back, I have to go back up to medical and get you some more meds, because I just did something stupid with your medication." (*Id.*).

At approximately 7:10 pm, Nurse Wadley "returned back to the unit with a different escorting officer, Defendant C/O Kinner and went directly to Plaintiff's and told Plaintiff that she now has his medications, then gave Plaintiff another white folded up paper cup containing his meds." (*Id.*). After taking his medications, Plaintiff asked Nurse Wadley whose medications he consumed earlier that evening. (*Id.*). Nurse Wadley "informed Plaintiff that she had given him 15 cell, Mr. Ronald Alston's meds, and claimed that they

4

were only fiber pills", but Plaintiff reported feeling "dizzy, drowsy and lightheaded." (*Id.*). While Defendants Wadley and Kinner were still present at Plaintiff's cell, Plaintiff "screamed out to Mr. Alston and asked him to name all of his medications", which were the same ones Nurse Wadley read aloud earlier. (*Id.*). When asked if all of his pills were fiber pills, Mr. Alton responded "no". (*Id.*). Plaintiff claims that he then demanded medical attention, and to "get Mr. Alston's pills pumped from his stomach and asked to speak with a psychotherapist." (*Id.*). However, Nurse Wadley just "walked down the stairs (with a smirk on her face)" and "screamed out to plaintiff and stated: 'they was only fiber pills just get some sleep you'll be ok'." (*Id.*).

At approximately 7:20 pm, Defendant Correctional Officer Kinner returned to Plaintiff's cell by himself and stated "[t]hat whole situation was wrong, I'm going to get with Sgt. Johnson about getting you some medical attention." (*Id*). At approximately 7:30, Defendant Sgt. Johnson arrived at Plaintiff's cell door "with a grievance in his hand and instructed Plaintiff to file a grievance" and "told Plaintiff to inform staff if his symptoms get worst." (*Id.*).

At approximately 8:30 pm, "plaintiff stopped Defendant C/O Hill during his rounds, requested medical attention, informed him of the conversation between himself and the Sgt, and told him that his symptoms had gotten worst [*sic*]." (*Id.*). Defendant Hill responded "'ok' and that he was going to get with Sgt. Johnson about getting him some medical attention, then C/O Hill left." (*Id.*). Moments later, Defendant Johnson "reappeared at

Plaintiff's cell door and stated, "I contacted the medical department and informed them of the situation, but they said they are not coming', before leaving again." (*Id.*).  Plaintiff claims that "for the next several hours plaintiff had to endure all of what he was experiencing without any medical or mental health attention, while at the same time of already having an existing belief that the department of corrections is out to kill him." (*Id.*).  He states that he "begin [*sic*] to hyperventilate, and tried laying down to calm his nerves and bring his anxiety down, but once plaintiff laid down, his heart begin [*sic*] to beat in his chest very fast." (*Id.*).  He "then tried getting back up, but quickly collapsed and hit his head in the process". (*Id.*).  Plaintiff "laid there on the floor for a while afraid to move, and not even knowing if he passed out or not." (*Id.*).

    At approximately 2:30 am on April 18, 2017, a third shift officer stopped at Plaintiff's cell and asked "if he was ok." (*Id.*).  Plaintiff "struggled to his feet, put water on his face and asked said officer for some medical attention." (*Id.*).  At approximately 2:45 am, "a male medical staff member arrived at Plaintiff's cell door to examine him" and after "Plaintiff explained his symptoms", the "male nurse/doctor asked that Plaintiff be taken to another cell that's empty so that Plaintiff can be hooked up to an E.K.G. machine." (*Id.*).  Plaintiff was then taken to the infirmary for a 23 hour observation period. (*Id.*).

    At approximately 8:30 am, Defendant, John Doe, MD, examined Plaintiff, who explained all his symptoms and facts surrounding what lead to his placement in the infirmary. (*Id.*).  Plaintiff claims, however, that when he "disclosed to the MD the fact that a

6

staff member caused his injuries, the MD didn't want to hear anything else the Plaintiff had to say, so the MD walked off." (*Id.*). At approximately 11:30 am, Plaintiff was discharged from the infirmary and taken back to his cell, "without speaking to someone from mental health or without receiving medical attention for the incorrect pills that he had consumed", nor was Plaintiff "treated for the lump on his head from when he collapsed on his cell floor." (*Id.*). Plaintiff states that he had "to submit a sick-call slip just to receive treatment for his head injury." (*Id.*).

On April 21, 2017, "Nurse Amie confirmed the lump(s) on Plaintiff's head, then prescribed and charged Plaintiff for the pain killers and medical sick-call visit." (*Id.*).

Plaintiff states that 'from the date of the incident, to the date Plaintiff left SCI-Camp Hill, Plaintiff refused to accept any and all medications from Ms. Wadley" and when he "explained to Ms. Wadley how cruel and unusual that was for her to ignore the seriousness of [his] health, she responded back by stating 'sue me'." (*Id.*).

On April 24, 2017, Plaintiff filed Grievance No. 67400 regarding the April 17, 2017 incident. (Doc. 1 at 13, Official Inmate Grievance).

By Initial Review Response dated June 5, 2017, Plaintiff's grievance was upheld, in part, and denied, in part, based on the following:

> I am in receipt of your grievance. You seem to believe that the medications you were administered on April 17, 2017, during the evening medication pass by RN Karen Wadley were not the medications prescribed to/for you. You also claim that RN Wadley made a statement about the medications prescribed to another inmate and indicate you believe you may have been provided with one of those medications. Likewise, you claim distress as a

7

result of the occurrence.   You also claim she told another inmate she "did something dumb with his medication."   You claim she told you she gave you 15 cell medication but that it was Fiber.   You further indicate you believe you are being denied an enhanced snack bag.   Finally, you claim that the Medical Department failed to follow its own policy regarding your observation in the Infirmary POC overnight following the medication pass incident.

The snack bag order was discontinued by Psychiatry prior to this incident, apparently secondary to your refusal to have medication-monitoring labs drawn.   No snack bag will be provided to any inmate without a valid order.

I reviewed this incident with RN Karen Wadley and she recalled an issue with Fiberlax but does not recall the specifics.   The nurse was advised to thoroughly document such instances should they occur in the future so that there is additional documentation.

You were seen by Medical Department staff on the 10 PM to 6 AM shift, April 17-18, 2017.   Your complaint was of chest and abdominal pain and, as per Medical Department protocol you were fully assessed, the on-call MD was contacted, and you were placed in the Infirmary as a 23-hour observation for complaint of chest and abdominal pain.

Your vital signs were stable, your EKG was normal and unchanged from an earlier EKG performed in 2015, and, except for a lingering headache, and you were without complaint for the 6 AM to 2 PM nurse in the Infirmary.   You were examined, in person, by an MD within 6 hours of your initial complaint of chest/abdominal pain and within 4 hours of your observation admission to the Infirmary.   Furthermore, you reported to the MD that your chest pain was gone soon after it started and offered no further complaints. You were discharged back to E Block prior to noon.

As you were apparently admonished by Miss Sarah, you should double-check the medications before swallowing (or attempting to swallow) them.   After you take or try to swallow a medication, it can be very difficult to verify the medications being offered as the medications which you are prescribed.   Please address the nurse, if you have questions, before taking the medications.   You have the right to politely refuse medications which are prescribed for you or which you believe are not your prescribed medications.   Although our medication system indicates you were provided the correct medications on April 17, 2017, you may properly request that the medications being offered to you be checked by the Nurse Supervisor in the Dispensary via a call from E Block officers.   Our medication record system indicates

> you were provided with your PM medications as ordered on 04/17/17, your AM and PM medications on 04/18/17, and the following days. I find no evidence of her telling another inmate she "did something dumb" with his medication. Therefore, your grievance is upheld, in part, related to apparently being offered a medication, Fiberlax which was not prescribed to/for you, and is denied in the remaining parts. However, any additional requested relief is denied as the taking of Fiberlax had not consequences for your health and well-being.

(Doc. 1 at 15-16, Initial Review Response).

On June 15, 2017, Plaintiff filed an appeal to the Facility Manager (Doc. 1 at 17, Appeal), who, on June 29, 2017, upheld the Grievance Officer's response and denied any requested relief.   (Doc. 1 at 19, Facility Manager's Appeal Response).

Plaintiff's appeal to Final Review was denied on October 3, 2017 as follows:

> This office is in receipt of your appeal, has reviewed all applicable documents and consulted with relevant professional staff.   In your grievance, you ultimately claim that on 4/27/17[4], you were given another inmate's medication.   You assert that you suffered both mental and physical issues as a result.   You were taken to the POC for a period of time and take issue with being released early stating that it was only because the placement was the fault of medical staff.   You allege that this was negligence, malpractice, deliberate indifference, and a violation of your rights.   You seek an apology, additional staff training, and monetary relief.
>
> A review of the records by the Bureau of Health Care Systems (BHCS) reflects that the medical care provided was reasonable and appropriate.   The findings of the review concur with the Facility Manager's Response.   No evidence of wrong doing in the medical follow-up care for monitoring your receiving another inmate's medication was identified.   Based on the review, your appeal and requested relief is denied.
>
> It is noted that you take issue with the method of investigation.   Be advised that the method of investigation is not dictated by the inmate nor the grievance process.

---

[4]   The Court construes this date to be a typographical error, as Plaintiff's Complaint, and other supporting exhibits, reference April 17, 2017 as the actual date of the incident.

9

(Doc. 1 at 20, Final Appeal Decision).

On October 8, 2019, Plaintiff filed the above captioned action in which he seeks compensatory and punitive damages for Defendants negligence and deliberate indifference, in violation of the Eighth Amendment.  (Doc. 1, complaint).

## III.  Discussion

It is well-established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior.*  See, e.g., *Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 1546 F.2d 1077, 1082 (3d Cir.1976).  It is also well-settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement.  *Id.*  Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based.  *Id.*  As the Court stated in *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1998):

> A defendant in a civil rights action must have personal involvement in the alleged wrongs .... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. (Citations omitted).

*See also Fisher v. Matthews*, 792 F.Supp.2d 745 (M.D.Pa.2011) (citing *Rode, supra* ).

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  *See Estelle v.*

10

*Gamble*, 429 U.S. 97, 103-05 (1976).   In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."   *Natale v. Camden Cty. Correctional Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).   A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention."   *Monmouth Cty. Corn Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).   In addition, "if unnecessary and wanton infliction of pain results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment."   *Id.* (citation omitted).   A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   *Farmer*, 511 U.S. at 837.   A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment.   *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

For purposes of Eighth Amendment medical claims, non-medical staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit as follows:

> If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive not to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official ... will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

*Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. *See, e.g., id.* at 236-37 (citing *Durmer*, 991 F.2d at 69); *Garvey v. Martinez*, No. 08-2217, 2010 WL 569852, at *6-7 (M.D. Pa. 2010); *Hodge v. United States*, No. 06-1622, 2007 WL 2571938, at *5-6 (M.D. Pa. 2007). Moreover, a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the

incidents set forth in the complaint occurred.   *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

Plaintiff fails to set forth a viable Eighth Amendment medical claim against Defendants Harry, Kinner, Trojan, Hill and Johnson.   None of these Defendants are trained members of the medical staff subject to liability for an Eighth Amendment claim.   He has not sufficiently alleged that these Defendants provided him with medical care, or that any of these Defendants were aware that prison doctors or their assistants were not providing an appropriate level of care in response to his medical needs.   Nor has Plaintiff sufficiently alleged that these Defendants were aware of, or acquiesced in, purported Eighth Amendment medical care violations.   Because Plaintiff was under the care of medical experts, the non-medical Defendants were justified in believing that he was in capable hands.   *See Spruill*, 372 F.3d at 236; *Durmer*, 991 F.2d at 69.   Thus, Defendants Harry, Kinner, Trojan, Hill and Johnson are entitled to dismissal.

Deliberate indifference to a serious medical need[5] involves the "unnecessary and wanton infliction of pain."   *Estelle*, 429 U.S at 104.   Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir.1993), or

---

[5]   A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Correction Institute Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

"persistent conduct in the face of resultant pain and risk of permanent injury". *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir.1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979), quoting *Bowring v. Goodwin*, 551 F.2d 44, 48 (4th Cir.1977). Furthermore, deliberate indifference is generally not found when some level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct.13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

Here, Plaintiff's complaint centers on Defendant Nurse Wadley allegedly administering the wrong medication on one occasion, which caused Plaintiff to suffer uncomfortable, but temporary, side effects. Significantly, Plaintiff does not allege that any of the named Defendants refused or delayed needed medical treatment or denied him prescribed medication, nor does he allege that Defendant Wadley purposefully gave him the wrong medication with the intent to harm him. He simply claims that he was given incorrect

medication by Defendant Wadley, who Plaintiff claims "had a duty to treat inmates under standard of care and follow the laws." (Doc. 1 at 2). However, a single episode of mistakenly providing the wrong medication does not amount to a constitutional violation. *See, e.g., Bayton v. Monroe Cty. Prison*, 2013 WL 2897795 at *7-8 (M.D. Pa. June 11, 2013) (mistakenly providing pain medication that caused an adverse reaction in plaintiff amounted only to negligence that was not actionable under § 1983); *Richardson v. U.S.*, 2010 WL 2571855 (M.D. Pa. June 22, 2010) (isolated incident of mistakenly giving plaintiff another inmate's medication was insufficient to establish constitutional violation); *McCurry v. Nauroth*, 1990 WL 87326 at *3 (E.D. Pa. June 13, 1990) (an isolated incident of overprescribing three extra pills of Motrin was attributable to unintentional human error and did not amount to a constitutional violation). Consequently, Plaintiff's claim against Defendant Nurse Wadley for an erroneous prescription is one of mistake, negligence and/or malpractice only, and such claims are not cognizable in a § 1983 proceeding. *Id.; see also Hight v. New River Valley Regional Jail Med. Staff Dep't*, 2017 WL 530571, *2 (W.D. Va. Feb. 8, 2017) (finding nurse not deliberately indifference for giving inmate wrong prescription): *Mitchell v. Diamond Pharmacy Servs.*, 2014 WL 5393120, *2 (M.D. Pa. Oct. 23, 2014) (holding allegations that inmate received the wrong prescription medication do not rise to the level of a constitutional claim); *Wilkins v. Wetzel*, 2013 WL 5504491, *6 (W.D. Pa. Oct. 3, 2013) (nurse who mistakenly ordered the wrong prescription for inmate, and then forgot to order the correct prescription was not deliberately indifferent).

Moreover, Plaintiff's complaint and exhibits are devoid of any allegation that Plaintiff was denied a reasonable request for medical treatment. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *Ancata v. Prison Health Servs.,* 769 F.2d 700, 704 (11th Cir. 1985)). Nor does Plaintiff claim that Defendants disregarded an "excessive risk to his health or safety." *Wheeler v. Wetzel*, 2018 WL 4658472, *5 (Aug. 28, 2018) (quoting *Farmer*, 511 U.S. at 837). In fact, Plaintiff's own allegations and exhibits demonstrate that Plaintiff received medical treatment in response to both his complaints of ingesting the wrong medication and the lump on his head.[6] While Plaintiff would have preferred having his stomach pumped, instead of just being monitored for an adverse reaction, his difference of opinion with the prison's medical staff regarding the treatment which he received does not support a claim of cruel and unusual punishment. *Farmer*, 685 F. Supp at 1339; *McCracken*, 562 F.2d at 24. At most, the allegations in the complaint only rise to the level of mere negligence. As simple negligence cannot serve as a predicate to liability under § 1983, *Hudson v. Palmer*, 468 U.S. 517 (1984), Plaintiff's civil rights complaint fails to articulate an arguable constitutional claim.[7] *See White*, 897 F.2d at 108-110.

---

[6] With regard to Plaintiff's allegation that he was required to pay for the treatment and medication received for the lump on his head, there is nothing unconstitutional about a prison program that requires an inmate to pay for a small portion of his medical care so long as the provision of needed medical care is not conditioned on an inmate's ability or willingness to pay. *See Reynolds v. Wagner*, 128 F.3d 166, 174 (3d Cir. 1997). Plaintiff does not allege, nor do his exhibits indicate, that medical services were withheld for failure to pay. In fact, Plaintiff was seen by medical personnel, diagnosed, and provided treatment. Thus, Plaintiff has failed to sufficiently allege either an Eighth or Fourteenth Amendment violation based on the prison's medical co-pay requirement.

[7] To the extent that Plaintiff makes the conclusory allegation that this isolated incident of negligence was a result of the failure of Defendant, Correct Care Solutions, Inc., to properly supervise or train their employees, (*see* Doc. 1 at 9, 10), the Court finds that the Complaint's failure to manifest a cognizable

16

V.   Leave to Amend

When a complaint fails to present a *prima facie* case of liability, district courts must generally grant leave to amend before dismissing the complaint.  See *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000).   Specifically, the Third Circuit Court of Appeals has admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless such an amendment would be inequitable or futile."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008) (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). The federal rules allow for liberal amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits."  *Foman v. Davis*, 371 U.S. 178,182 (1962) (citations and internal quotations omitted).   For the reasons set forth above, the Court concludes that granting leave to amend with respect to the claims raised against the Defendants named herein would be futile.

V.   Conclusion

Based on the foregoing discussion, Plaintiff's complaint will be dismissed with

---

constitutional Eighth Amendment claim of deliberate indifference equally precludes a failure to train claim. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) (holding that a failure to train or supervise "must amount to deliberate indifference to the rights of person with whom the untrained employees come into contact"). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd of Cnty Cm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997).   "Deliberate indifference is more than simple negligence. It is a deliberate choice to follow a course of action that is made from among various alternatives without regard to the known or obvious consequences."  *Pelzer v. City of Philadelphia*, 656 F.Supp.2d 517, 532 (E.D. Pa. 2009) (internal citation and quotation marks omitted).   Consequently, any failure to train claim is dismissed.

prejudice for Plaintiff's failure to articulate a cognizable § 1983 claim.


Dated: April 20, 2020                                         *s/ Robert D. Mariani*____
                                                              Robert D. Mariani
                                                              United States District Judge